**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| OTIS McDONALD, et al., | ) | Case No. 08-CV-3645 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
|_____| ) | |

**MOTION TO NARROW LEGAL ISSUES
Fed. R. Civ. Proc. 16(a)(1), (c)(2)(A)**

NOW COME the Plaintiffs, OTIS McDONALD, ADAM ORLOV, COLLEEN

LAWSON, DAVID LAWSON, SECOND AMENDMENT FOUNDATION, INC. and ILLINOIS

STATE RIFLE ASSOCIATION, by and through LAW FIRM OF DAVID G. SIGALE, P.C. and

GURA & POSSESSKY, PLLC, their attorneys, and, pursuant to Rule 16(a)(1) and (c)(2)(A) of

the Federal Rules of Civil Procedure move this honorable Court to narrow the legal issues in this

matter by ruling the Second Amendment to the United States Constitution applies to the

Defendant CITY OF CHICAGO through the Fourteenth Amendment to the United States

Constitution.  In support thereof, Plaintiffs state as follows:

**INTRODUCTION**

In pleadings and appearances before the Court in this matter, as well as in public

statements, the parties and Court have acknowledged that the primary threshold legal issue in this

case is incorporation.  Plaintiffs submit that under any theory of Fourteenth Amendment

incorporation, Defendant is bound to respect their Second Amendment rights as recently

delineated in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). In contrast, Defendant maintains the Second Amendment does not apply to it.

The Court must therefore determine the critical issue of this case: whether the rights secured by the Second Amendment to the United States Constitution are applicable to state and local governments through the Privileges or Immunities and/or Due Process Clauses of the Fourteenth Amendment. It is especially wise to decide this before the parties engage in lengthy and costly discovery. It would also be a waste of judicial resources to litigate this case without expediently determining the legal issue that is, by everyone's account, the crux of the matter.

The Court has noted this, and suggested the filing of this motion.

The question of Fourteenth Amendment incorporation must be decided in Plaintiffs' favor. As described herein, the protection of the people's right to keep and bear arms against the states' attempted abridgements of that right was one of the primary purposes of the Fourteenth Amendment. It is widely acknowledged the Supreme Court wrongly interpreted the Privileges or Immunities Clause in *The Slaughter-House Cases,* giving it an unduly narrow interpretation that is long overdue for correction. Since Second Amendment incorporation through that provision is proper, Plaintiffs respectfully request this Court to avail itself of the opportunity to honor the original intent, meaning, and plain text of the Fourteenth Amendment by holding the Second Amendment's freedoms apply to the Defendant in this case.

Additionally, the United States Supreme Court has ruled that certain fundamental Constitutional rights, including those enumerated in the Bill of Rights, are incorporated as against the states through the Fourteenth Amendment's Due Process Clause. Applying the modern selective incorporation test of whether a right is to be incorporated, as described in

*Duncan* v. *Louisiana*, 391 U.S. 145 (1968), the only proper conclusion is that the rights secured

by the Second Amendment must be incorporated as against the states and their political

subdivisions, including the Defendant, via the Due Process Clause of the Fourteenth

Amendment.  The cases relied upon by Defendant were decided before the advent of the modern

incorporation doctrine, and thus did not acknowledge or engage in the required incorporation

analysis.

Plaintiffs respectfully request this Court enter an order holding that the rights secured by

the Second Amendment to the United States Constitution are incorporated as against the

Defendant through the Privileges or Immunities and/or Due Process Clauses of the Fourteenth

Amendment.

## STATEMENT OF FACTS

On June 27, 2008, the United States Supreme Court struck down Washington, D.C.'s

municipal handgun ban and ban on the possession of functional firearms for self-defense as

violations of Second Amendment rights.  *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008).

Plaintiffs filed the instant suit the same day.  In addition to banning home handgun possession,

these ordinances require the registration of non-banned firearms prior to possessing them, in

circumstances that sometimes make firearm ownership impossible, and further impose

unnecessary and burdensome annual firearm re-registration requirements.  There is no practical

distinction between Washington, D.C.'s former handgun ban and the handgun ban maintained by

Defendant.  Under *Heller*, Defendant's ordinances banning residents' possession of handguns in

their homes for self-defense, as well as certain ordinances governing firearm pre-registration and

re-registration requirements, plainly violate Plaintiffs' Second Amendment rights.

3

The individual Plaintiffs assert in their Complaint that they applied for permits to own handguns and various long arms in their homes, and that these applications were denied by Defendant, or are subject to the various challenged registration restrictions. In its Amended Answer, Defendant admits both the applications and denials, even citing the respective ordinances on which the denials were based, and does not otherwise challenge the content and operation of the ordinances as alleged by Plaintiff. Defendant's sole affirmative defense is that the Complaint fails to state a claim.

## SUMMARY OF ARGUMENT

Applying Fourteenth Amendment incorporation analysis to the Second Amendment right to keep and bear arms, there can be only one result: the Second Amendment's freedoms apply to the states and their political subdivisions, including the Defendant.

The right to keep and bear arms is among the privileges or immunities of United States citizenship which the states are forbidden from abridging. Indeed, the Fourteenth Amendment was intended and originally understood to stop the states' abridgement of the right to keep and bear arms. The Fourteenth Amendment's Privileges or Immunities Clause may have been given a wrong, parsimoniously narrow interpretation by the Supreme Court in *The Slaughter-House Cases,* 83 U.S. (16 Wall.) 36 (1873), but Second Amendment incorporation through that provision remains the most logical course of action. Considering the widely held view that the current Privileges or Immunities Clause jurisprudence is incorrect, and the recent suggestion by an Associate Justice of the Supreme Court that this doctrine be revisited, Plaintiffs would in good faith urge that this precedent be reconsidered to better honor the original intent, meaning, and plain text of the Fourteenth Amendment.

4

Yet other precedent requires a ruling in Plaintiffs' favor on the issue of Fourteenth Amendment incorporation. However *Slaughter-House* hampers incorporation through the Privileges or Immunities Clause, the Supreme Court's well-established doctrine of selective incorporation through the Fourteenth Amendment's Due Process Clause mandates that Defendant respect its residents' Second Amendment rights.

Applying the Second Amendment to the challenged laws, the latter must yield. A ban on the home possession of handguns by law-abiding adults is clearly unconstitutional. *Heller,* 128 S. Ct. at 2818. And while *Heller* did not purport to define the precise standard of review under which gun regulations must be examined in Second Amendment cases, Defendant's re-registration and pre-acquisition registration requirements, and "unregisterability" penalty, fail any possible standard of review.

The outcome of this case thus hinges upon resolution of the incorporation question.

## ARGUMENT

### I. THE RIGHT TO ARMS SECURED BY THE SECOND AMENDMENT IS A PRIVILEGE OR IMMUNITY WITHIN THE MEANING OF THE FOURTEENTH AMENDMENT, WHICH THE STATES SHALL NOT ABRIDGE.

The Fourteenth Amendment provides, in pertinent part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, sec. 1, cl. 2. The Fourteenth Amendment Privileges or Immunities Clause was originally intended and understood to incorporate the Bill of Rights – including, specifically, the Second Amendment – as against the states. It should be given this effect today.

Plaintiffs acknowledge that this argument is foreclosed in this Court by *The Slaughter-House Cases,* 83 U.S. (16 Wall.) 36 (1873), holding that the Privileges or Immunities Clause

guarantees only rights that flow from the existence of United States citizenship, such as the rights

to diplomatic protection abroad or to access the navigable waterways of the United States.

*Slaughter-House* may be binding law, but "'everyone' agrees the Court [has] incorrectly

interpreted the Privileges or Immunities Clause." Richard L. Aynes, *Constricting the Law of*

*Freedom. Justice Miller, the Fourteenth Amendment, and the Slaughter-House Cases,* 70 Chi.

Kent L. Rev. 627 (1994); *see also* Laurence H. Tribe, *Taking Text and Structure Seriously.*

*Reflections on Free-Form Method in Constitutional Interpretation,* 108 Harv. L. Rev. 1121, 1297

n. 247 (1995) *("[T]he Slaughter-House Cases* incorrectly gutted the Privileges or Immunities

Clause"); Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment,* 101 Yale L.J.

1193, 1258-59 (1992).

     "Legal scholars agree on little beyond the conclusion that the Clause does not mean what

the Court said it meant in 1873." *Saenz* v. *Roe,* 526 U.S. 489, 523 n.1 (1999) (Thomas, J.,

dissenting) (citations omitted). Indeed, Justice Thomas, joined by Chief Justice Rehnquist,

declared that he "would be open to reevaluating [the Privileges or Immunities Clause's] meaning

in an appropriate case." *Saenz,* 526 U.S. at 528 (Thomas, J., dissenting).[1] This is such an

appropriate case, considering that no modern court has considered the interplay between the

Second Amendment, properly understood, and the Fourteenth Amendment.

     Before the Civil War, the Supreme Court held that states were not bound by the Bill of

Rights. *Barron ex rel. Tiernan* v. *Mayor of Baltimore,* 32 U.S. (7 Pet.) 243 (1833). *Barron*

---

[1]"Since the adoption of [the Fourteenth] Amendment, ten Justices have felt that it protects from infringement by the States the privileges, protections, and safeguards granted by the Bill of Rights . . . Unfortunately it has never commanded a Court. Yet, happily, all constitutional questions are always open." *Gideon* v. *Wainright,* 372 U.S. 335, 345-46 (1963) (Douglas, J., concurring) (citation omitted).

proved intolerable during Reconstruction.  With recalcitrant southern states actively oppressing

Americans just freed from slavery, Congress saw the need to constitutionally define American

citizenship and imbue that citizenship with meaningful federal protection.  Thus the Fourteenth

Amendment's first section was designed to overrule two Supreme Court precedents.  The first

clause dispensed with *Scott* v. *Sandford,* 60 U.S. (19 How.) 393 (1857), which held that people

of African descent could not be American citizens or citizens of American states.  The Privileges

or Immunities Clause was aimed squarely at overruling *Barron*.

> "[I]n drafting section one," Fourteenth Amendment author Rep. John Bingham
>
> looked to *Barron* itself for guidance. Within the words of Chief Justice John Marshall he
> found clear instructions: "Had the framers of these amendments intended them to be
> limitations on the powers of the state governments, they would have imitated the framers
> of the original constitution, and have expressed that intention."

Michael Anthony Lawrence, *Second Amendment Incorporation Through the Privileges or*

*Immunities and Due Process Clauses,* 72 Mo. Law. R. 1, 18 (2007) (hereafter "Lawrence")

(quoting Cong. Globe, 42d Cong., 1st Sess. 84 App. (1871); *Barron,* 32 U.S. at 250).   The

opening words of the Privileges or Immunities Clause thus imitate directly the command of

Article I, Section 10 referenced by *Barron:* "No state shall."  Bingham made explicit that

*Barron*'s suggestion was followed in order to bind the states.  *Id*. at 18-19 and citations therein.

As for the privileges and immunities that "no state shall . . . abridge," these included, at a

minimum, the Bill of Rights.  "Congress in 1866 understood perfectly well that section one was

intended to repudiate *Barron.*  'Over and over [John Bingham] described the privileges-or-

immunities clause as encompassing 'the bill of rights' – a phrase he used more than a dozen

times in a key speech . . .'" Lawrence, 72 Mo. L. Rev. at 19 (quoting Akhil Reed Amar, THE BILL

OF RIGHTS 182 (1998) (hereafter "Amar"). The Fourteenth Amendment's Senate sponsor, Senator Jacob Howard, explained the Privileges or Immunities Clause's incorporating scope:

> To these privileges and immunities, whatever they may be – for they are not and cannot be fully defined in their entire extent and precise nature – to these should be added the personal right guarantied and secured by the first eight amendments of the Constitution; such as the freedom of speech, . . . *and the right to keep and to bear arms* . . . . The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees.

Cong. Globe, 39th Cong., 1st Sess. 2765-66 (1866) (emphasis added).

These and numerous other widely-reported congressional comments expressing the Fourteenth Amendment's repudiation of *Barron* were unopposed. Amar, at 186-87. Indeed, the Fourteenth Amendment's southern opponents understood that the Privileges or Immunities Clause incorporated the Bill of Rights, as did those who promoted the Fourteenth Amendment's ratification among the states. *See discussion in* Lawrence, at 22-27. Arguably, the right to keep and bear arms was the right whose incorporation was most urgently desired. "With respect to the proposed [Fourteenth] Amendment, Senator Pomeroy described as one of the three "indispensable" "safeguards of liberty . . . under the Constitution" a man's "right to bear arms for the defense of himself and family and his homestead." *Heller,* 128 S. Ct. at 2811 (citing Cong. Globe, 39th Cong., 1st Sess., 1182 (1866)).

Accordingly, until *Slaughter-House,* it was perfectly understood by fans and foes of the Fourteenth Amendment alike that the Privileges or Immunities Clause incorporates the entire Bill of Rights as against the states – including the Second Amendment. For purposes of this Motion, it suffices to note that *Slaughter-House*'s evisceration of the Privileges or Immunities Clause was wrong when it was decided and remains wrong today.

8

II.     **THE SECOND AMENDMENT IS INCORPORATED UNDER THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE.**

*Slaughter-House* may have rendered the Privileges or Immunities Clause meaningless, but the Supreme Court would discover another approach to Fourteenth Amendment incorporation. It is now well-established that the amendment's Due Process Clause has a substantive dimension, and that deprivation of enumerated constitutional rights is thus largely incompatible with due process. Almost every provision of the Bill of Rights considered for incorporation in the modern era has been incorporated.

In the early days of incorporation, the Supreme Court explained that "immunities that are valid as against the federal government by force of the specific pledges of particular amendments have been found to be implicit in the concept of ordered liberty, and thus, through the Fourteenth Amendment, become valid as against the states." *Palko* v. *Connecticut*, 302 U.S. 319, 324-25 (1937). The Second Amendment, given its forceful command and basis in the inherent human right of self-preservation, would surely pass this test. But the Supreme Court would settle on an analysis proven yet more amenable to incorporation. The modern incorporation test asks whether a right is "fundamental to the American scheme of justice," *Duncan* v. *Louisiana*, 391 U.S. 145, 149 (1968), or "necessary to an Anglo-American regime of ordered liberty," *id.*, at 150 n.14. *Duncan*'s analysis suggested looking to the right's historical acceptance in our nation, its recognition by the states, any trend regarding state recognition, and the purpose behind the right.

The right to bear arms clearly meets the modern incorporation standard. "By the time of the founding, the right to have arms had become fundamental for English subjects." *Heller*, at 2798 (citations omitted). The violation of that right by George III "provoked polemical reactions

by Americans invoking their rights as Englishmen to keep arms." *Id.*, at 2799. The Second

Amendment "codified a right inherited from our English ancestors." *Id.*, at 2802 (citation

omitted). Indeed, when the constitution was considered, demands for a bill of rights prevailed in

five of seven constitutional ratifying conventions. The only provisions common to all bill of

rights demands were freedom of religion and the right to arms.

Forty-four of the fifty states secure a right to arms in their constitutions, and of these,

fifteen are either new or strengthened since 1970. Eugene Volokh, *State Constitutional Rights to

Keep and Bear Arms*, 11 Tex. Rev. Law & Pol. 191 (2006). And in *Heller*, thirty-two states

advised the Supreme Court that the individual Second Amendment "is properly subject to

incorporation." Brief of Amici States Texas, et al., Supreme Court No. 07-290, at 23 n.6.[2]

The Second Amendment's purpose confirms its incorporation. "The inherent right of

self-defense has been central to the Second Amendment right." *Heller*, at 2818. Blackstone

described that right as preserving "'the natural right of resistance and self-preservation,' and 'the

right of having and using arms for self-preservation and defence.'" *Heller*, at 2792 (citations

omitted). The Supreme Court binds the states to respect unenumerated rights which, like the

Second Amendment, are rooted in deference to preserving personal autonomy. Observing that

"no right is held more sacred, or is more carefully guarded, by the common law, than the right of

every individual to the possession and control of his own person, free from all restraint or

interference of others, unless by clear and unquestionable authority of law," *Cruzan* v. *Dir., Mo.

Dept. of Health*, 497 U.S. 261, 269 (1990) (citation omitted), the Supreme Court recognized a

right to refuse life-sustaining medical care. *Id.*, at 278; *see also Eisenstadt* v. *Baird*, 405 U.S.

---

[2]North Carolina joined the brief's 31 original signatories by letter.

10

438, 453 (1972) ("the right of the individual . . . to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"); *Lawrence* v. *Texas*, 539 U.S. 558, 562 (2003) ("liberty of the person both in its spatial and more transcendent dimensions" supports right to consensual intimate relationships); *Rochin* v. *California*, 342 U.S. 165 (1952) (right of bodily integrity against police searches).

It is unfathomable that the states are constitutionally limited in their regulation of medical decisions or intimate relations, because these matters touch upon personal autonomy, but are unrestrained in their ability to trample upon the enumerated right to arms designed to enable self-preservation. If abortion is protected because "[a]t the heart of liberty is the right to define one's own concept of existence," *Planned Parenthood* v. *Casey*, 505 U.S. 833, 851 (1992), the right of armed self-defense against violent criminal attack is surely deserving of incorporation. Indeed, *Casey* invoked the second Justice Harlan's celebrated passage describing the liberty protected by the Due Process Clause as broader than "a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; *the right to keep and bear arms*; the freedom from unreasonable searches and seizures; and so on." *Id.*, at 848 (quoting *Poe* v. *Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting)) (emphasis added). Liberty cannot now be defined so narrowly as to exclude one of its more obvious attributes.

The Second Amendment also has another purpose, spelled out in the prefatory clause: preservation of the people's ability to act as militia. *Heller*, at 2800-01. The amendment's framers believed this purpose was "necessary to the security of a free state." U.S. Const. amend. II. By its own terms, the Second Amendment secures a fundamental right.

Three Supreme Court decisions have rejected the Second Amendment's direct application

11

to the states. But these holdings predate and therefore did not discuss the incorporation doctrine.

> With respect to *Cruikshank*'s [*United States* v. *Cruikshank*, 92 U.S. 542 (1876)] continuing validity on incorporation, a question not presented by this case, we note that *Cruikshank* also said that the First Amendment did not apply against the States and did not engage in the sort of Fourteenth Amendment inquiry *required by our later cases*.

*Heller*, 128 S. Ct. at 2813 n.23 (emphasis added).

 *Heller* noted that *Presser* v. *Illinois*, 116 U.S. 252 (1886) and *Miller* v. *Texas*, 153 U.S. 535 (1894) "reaffirmed that the Second Amendment applies only to the Federal Government." *Id.* But both these cases precede the incorporation era, and suffer from the same flaw that renders *Cruikshank* non-authoritative: an absence of the "required" modern incorporation analysis. *See also Duncan*, 391 U.S. at 155 (complete non-incorporation "a position long since repudiated"). *Miller*'s observation that the Second Amendment did not bind the states referenced the Fourth Amendment for the same proposition. *Miller*, 153 U.S. at 538. Clearly the city would not cite *Miller*'s language for the proposition that its police force need not obey the Fourth Amendment. In any event, *Miller*'s non-incorporation language is dicta; the case was dismissed because the constitutional claims were not preserved at trial. *Miller*, 153 U.S. at 537-38.

 As for *Presser*, the Supreme Court in that case reasoned that the Second Amendment "is one of the amendments that has no other effect than to restrict the powers of the National government." *Presser*, 116 U.S. at 265. Among the other amendments suggested by *Presser* as not being incorporated are the First (citing *Cruikshank*), Fifth,[3] and Sixth.[4] *Id. Presser* relied

---

[3]Takings Clause not incorporated, citing *Barron;* Double Jeopardy Clause not incorporated, citing *Fox* v. *Ohio*, 46 U.S. (5 How.) 410 (1847).

[4]Right to be informed of accusation not incorporated, citing *Twitchell* v. *Commonwealth*, 74 U.S. (7 Wall.) 321 (1869); right to criminal jury trial not incorporated, citing *Murphy* v. *People*, 2 Cow. 815 (N.Y. 1824).

upon cases that are clearly no longer authoritative, and failed to engage in the now-required incorporation analysis that would not be announced until deep into the following century.

The Seventh Circuit once reasoned that *Presser* precluded Second Amendment incorporation. *Quilici* v. *Village of Morton Grove*, 695 F.2d 261 (7th Cir. 1982). But *Quilici* has been all but overruled by *Heller*. *Quilici*'s dicta that "the right to keep and bear handguns is not guaranteed by the Second Amendment," *Quilici*, 695 F.2d at 270 (footnote omitted), is no longer recognized as law. As for *Presser*'s relevance to incorporation, *Quilici* noted that "appellants offer[ed] no authority, other than their own opinions, to support their arguments that *Presser* is no longer good law or would have been decided differently today." *Quilici*, 695 F.2d at 270.

Times have changed. As noted *supra*, the Supreme Court explained that *Cruikshank*, upon which *Presser* relied, did not "engage in the sort of Fourteenth Amendment inquiry required by our later cases." *Heller*, at 2813 n.23. *Quilici*'s refusal to consider "historical analysis of the development of English common law and the debate surrounding the adoption of the second and fourteenth amendments," *Quilici*, 695 F.2d at 270 n.8, key aspects of "the sort of inquiry" now "required" by *Heller*, at 2813 n.23, further undercut *Quilici*'s authority.

Since *Quilici*, two circuits concluded *Presser* had been overtaken by the incorporation doctrine. Judge Reinhardt, in elucidating the "collective right" theory rejected in *Heller*, agreed that *Presser* and *Cruikshank* "rest on a principle that is now thoroughly discredited." *Silveira* v. *Lockyer*, 312 F.3d 1052, 1066 n.17 (9th Cir. 2002) (citing *United States* v. *Emerson*, 270 F.3d 203, 221 n.13 (5th Cir. 2001)). After *Heller*, the Seventh Circuit would surely conduct a modern incorporation analysis, as should this Court. *Quilici* poses no obstacle. "Our decisions do not bind the district court when there has been a relevant intervening change in the law." *EEOC* v.

13

*Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005) (citation omitted); *cf. Cameo Convalescent Center, Inc.* v. *Percy*, 800 F.2d 108, 110 (7th Cir. 1986). *Heller*'s limitation of *Cruikshank*, and instruction that modern incorporation analysis is required to resolve the issue of Second Amendment incorporation, constitute a relevant intervening change in the law. The Village of Morton Grove must understand *Quilici*'s limitations, as it just repealed its handgun ban in the face of a post-*Heller* challenge. Robert Channick, *Morton Grove repeals 27-year old gun ban*, Chicago Tribune (July 28, 2008).

## CONCLUSION

Incorporation is the controlling, threshold legal issue in this case. In the interest of judicial efficiency, this Court should, at this time, determine whether the Second Amendment applies to the Defendant. Under the modern incorporation doctrine, Defendant is bound to respect Plaintiffs' Second Amendment rights by operation of the Privileges or Immunities and/or the Due Process Clauses of the Fourteenth Amendment.

Plaintiffs respectfully request this Court rule on this legal issue in their favor, and that this Court grant Plaintiffs all further relief consistent with that ruling.

Dated: October 21, 2008

Respectfully submitted,

Alan Gura (admitted *pro hac vice*)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

David G. Sigale (Atty. ID# 6238103)
Law Firm of David G. Sigale, P.C.
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
630.452.4547/Fax 630.596.4445

By:  /s/ Alan Gura/
     Alan Gura

By:      /s/ David G. Sigale/
     David G. Sigale

Attorneys for Plaintiffs

14

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on October 21, 2008, he served a copy of the above **Fed. R. Civ. Proc. 16(a)(1) and (c)(2)(A) Motion to Narrow Legal Issues,** and this certificate of service, on:

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
City of Chicago Department of Law
Constitutional and Commercial Litigation Division
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF). Pursuant to FRCP 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.

The undersigned also effect service of the foregoing on:

Stephen A. Kolodziej (Counsel for Plaintiffs in NRA v. City of Chicago, No. 08-3697)
Brenner, Ford, Monroe & Scott
33 N. Dearborn Street, Suite 300
Chicago, IL 60602
Fax: 312-781-9202

Stephen Halbrook (Counsel for Plaintiffs in NRA v. City of Chicago, No. 08-3697) 10560
Main Street, Suite 404
Fairfax, VA 22030
Fax: 703-359-0938

by facsimile and by first class United States Mail, postage pre-paid.

                                      _____/s/David G. Sigale_____
                                             David G. Sigale