
CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the
# United States Court of Appeals
## For the Seventh Circuit SMM

Nos. 08-4241, 08-4243 & 08-4244

NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., *et al.*,

*Plaintiffs-Appellants*,

v.

CITY OF CHICAGO, ILLINOIS, and
VILLAGE OF OAK PARK, ILLINOIS,

*Defendants-Appellees*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 08 C 3645 *et al.*—**Milton I. Shadur**, *Judge*.

ARGUED MAY 26, 2009—DECIDED JUNE 2, 2009

Before EASTERBROOK, *Chief Judge*, and BAUER and POSNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Two municipalities in Illinois ban the possession of most handguns. After the Supreme Court held in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), that the second amendment entitles people to keep

handguns at home for self-protection, several suits were filed against Chicago and Oak Park. All were dismissed on the ground that *Heller* dealt with a law enacted under the authority of the national government, while Chicago and Oak Park are subordinate bodies of a state. The Supreme Court has rebuffed requests to apply the second amendment to the states. See *United States v. Cruikshank*, 92 U.S. 542 (1876); *Presser v. Illinois*, 116 U.S. 252 (1886); *Miller v. Texas*, 153 U.S. 535 (1894). The district judge thought that only the Supreme Court may change course. 2008 U.S. Dist. LEXIS 98134 (N.D. Ill. Dec. 4, 2008).

*Cruikshank*, *Presser*, and *Miller* rejected arguments that depended on the privileges and immunities clause of the fourteenth amendment. The *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873), holds that the privileges and immunities clause does not apply the Bill of Rights, en bloc, to the states. Plaintiffs respond in two ways: first they contend that *Slaughter-House Cases* was wrongly decided; second, recognizing that we must apply that decision even if we think it mistaken, plaintiffs contend that we may use the Court's "selective incorporation" approach to the second amendment. *Cruikshank*, *Presser*, and *Miller* did not consider that possibility, which had yet to be devised when those decisions were rendered. Plaintiffs ask us to follow *Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009), which concluded that *Cruikshank*, *Presser*, and *Miller* may be bypassed as fossils. (*Nordyke* applied the second amendment to the states but held that local governments may exclude weapons from public buildings and parks.) Another court of appeals has concluded that *Cruikshank*, *Presser*, and *Miller* still control even though their reasoning is obsolete.

Nos. 08-4241, 08-4243 & 08-4244 3

*Maloney v. Cuomo*, 554 F.3d 56 (2d Cir. 2009). We agree with *Maloney*, which followed our own decision in *Quilici v. Morton Grove*, 695 F.2d 261 (7th Cir. 1982).

Repeatedly, in decisions that no one thinks fossilized, the Justices have directed trial and appellate judges to implement the Supreme Court's holdings even if the reasoning in later opinions has undermined their rationale. "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). *Cruikshank*, *Presser*, and *Miller* have "direct application in [this] case". Plaintiffs say that a decision of the Supreme Court has "direct application" only if the opinion expressly considers the line of argument that has been offered to support a different approach. Yet few opinions address the ground that later opinions deem sufficient to reach a different result. If a court of appeals could disregard a decision of the Supreme Court by identifying, and accepting, one or another contention not expressly addressed by the Justices, the Court's decisions could be circumvented with ease. They would bind only judges too dim-witted to come up with a novel argument.

Anyone who doubts that *Cruikshank*, *Presser*, and *Miller* have "direct application in [this] case" need only read footnote 23 in *Heller*. It says that *Presser* and *Miller* "reaffirmed [*Cruikshank*'s holding] that the Second Amendment applies only to the Federal Government." 128 S. Ct. at 2813

n.23. The Court did not say that *Cruikshank*, *Presser*, and *Miller* rejected a particular *argument* for applying the second amendment to the states. It said that they hold "that the Second Amendment applies only to the Federal Government." The Court added that "*Cruikshank*'s continuing validity on incorporation" is "a question not presented by this case". *Ibid*. That does not license the inferior courts to go their own ways; it just notes that *Cruikshank* is open to reexamination by the Justices themselves when the time comes. If a court of appeals may strike off on its own, this not only undermines the uniformity of national law but also may compel the Justices to grant certiorari before they think the question ripe for decision.

*State Oil Co. v. Khan*, 522 U.S. 3 (1997), illustrates the proper relation between the Supreme Court and a court of appeals. After *Albrecht v. Herald Co.*, 390 U.S. 145 (1968), held that antitrust laws condemn all vertical maximum price fixing, other decisions (such as *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)) demolished *Albrecht*'s intellectual underpinning. Meanwhile new economic analysis showed that requiring dealers to charge no more than a prescribed maximum price could benefit consumers, a possibility that *Albrecht* had not considered. Thus by the time *Khan* arrived on appeal, *Albrecht*'s rationale had been repudiated by the Justices, and new arguments that the *Albrecht* opinion did not mention strongly supported an outcome other than the one that *Albrecht* announced. Nonetheless, we concluded that only the Justices could inter *Albrecht*. See *Khan v. State Oil Co.*, 93 F.3d 1358 (7th Cir. 1996). By plaintiffs' lights, we should have treated *Albrecht* as defunct and reached what we

Nos. 08-4241, 08-4243 & 08-4244  5

deemed a better decision. Instead we pointed out *Albrecht*'s shortcomings while enforcing its holding. The Justices, who overruled *Albrecht* in a unanimous opinion, said that we had done exactly the right thing, "for it is this Court's prerogative alone to overrule one of its precedents." 522 U.S. at 20. See also, e.g., *Eberhart v. United States*, 546 U.S. 12 (2005).

What's more, the proper outcome of this case is not as straightforward as the outcome of *Khan*. Although the rationale of *Cruikshank*, *Presser*, and *Miller* is defunct, the Court has not telegraphed any plan to overrule *Slaughter-House* and apply all of the amendments to the states through the privileges and immunities clause, despite scholarly arguments that it should do this. See Akhil Reed Amar, *America's Constitution: A Biography* 390–92 (2005) (discussing how the second amendment relates to the privileges and immunities clause). The prevailing approach is one of "selective incorporation." Thus far neither the third nor the seventh amendment has been applied to the states—nor has the grand jury clause of the fifth amendment or the excessive bail clause of the eighth. How the second amendment will fare under the Court's selective (and subjective) approach to incorporation is hard to predict.

*Nordyke* asked whether the right to keep and bear arms is "deeply rooted in this nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). It gave an affirmative answer. Suppose the same question were asked about civil jury trials. That institution also has deep roots, yet the Supreme Court has not held that the

6                                           Nos. 08-4241, 08-4243 & 08-4244

states are bound by the seventh amendment. Meanwhile the Court's holding that double-jeopardy doctrine is not "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (concluding that it is enough for the state to use res judicata to block relitigation of acquittals), was overruled in an opinion that paid little heed to history. *Benton v. Maryland*, 395 U.S. 784 (1969). "Selective incorporation" thus cannot be reduced to a formula.

Plaintiffs' reliance on William Blackstone, 1 *Commentaries on the Laws of England* *123–24, for the proposition that the right to keep and bear arms is "deeply rooted" not only slights the fact that Blackstone was discussing the law of another nation but also overlooks the reality that Blackstone discussed arms-bearing as a *political* rather than a *constitutional* right. The United Kingdom does not have a constitution that prevents Parliament and the Queen from matching laws to current social and economic circumstances, as the people and their representatives understand them. It is dangerous to rely on Blackstone (or for that matter modern European laws banning handguns) to show the meaning of a constitutional amendment that this nation adopted in 1868. See Nicholas Quinn Rosenkranz, *Condorcet and the Constitution*, 59 Stan. L. Rev. 1281 (2007). Blackstone also thought determinate criminal sentences (*e.g.*, 25 years, neither more nor less, for robbing a post office) a vital guarantee of liberty. 4 *Commentaries* *371–72. That's not a plausible description of American constitutional law.

One function of the second amendment is to prevent the national government from interfering with state militias. It

Nos. 08-4241, 08-4243 & 08-4244                           7

does this by creating individual rights, *Heller* holds, but those rights may take a different shape when asserted against a state than against the national government. Suppose Wisconsin were to decide that private ownership of long guns, but not handguns, would best serve the public interest in an effective militia; it is not clear that such a decision would be antithetical to a decision made in 1868. (The fourteenth amendment was ratified in 1868, making that rather than 1793 the important year for determining what rules must be applied to the states.) Suppose a state were to decide that people cornered in their homes must surrender rather than fight back—in other words, that burglars should be deterred by the criminal law rather than self help. That decision would imply that no one is entitled to keep a handgun at home for self-defense, because self-defense would itself be a crime, and *Heller* concluded that the second amendment protects only the interests of law-abiding citizens. See *United States v. Jackson*, 555 F.3d 635 (7th Cir. 2009) (no constitutional right to have guns ready to hand when distributing illegal drugs).

Our hypothetical is not as farfetched as it sounds. Self-defense is a common-law gloss on criminal statutes, a defense that many states have modified by requiring people to retreat when possible, and to use non-lethal force when retreat is not possible. Wayne R. LaFave, 2 *Substantive Criminal Law* §10.4 (2d ed. 2003). An obligation to avoid lethal force in self-defense might imply an obligation to use pepper spray rather than handguns. A modification of the self-defense defense may or may not be in the best interest of public safety—whether guns deter or facilitate crime is

8                                     Nos. 08-4241, 08-4243 & 08-4244

an empirical question, compare John R. Lott, Jr., *More Guns, Less Crime* (2d ed. 2000), with Paul H. Rubin & Hashem Dzehbakhsh, *The effect of concealed handgun laws on crime*, 23 International Rev. L. & Econ. 199 (2003), and Mark Duggan, *More Guns, More Crime*, 109 J. Pol. Econ. 1086 (2001)—but it is difficult to argue that legislative evaluation of which weapons are appropriate for use in self-defense has been out of the people's hands since 1868. The way to evaluate the relation between guns and crime is in scholarly journals and the political process, rather than invocation of ambiguous texts that long precede the contemporary debate. See *Clark v. Arizona*, 548 U.S. 735 (2006) (state may reformulate, and effectively abolish, insanity defense); *Martin v. Ohio*, 480 U.S. 228 (1987) (state may assign to defendant the burden of raising, and proving, self-defense).

Chicago and Oak Park are poorly placed to make these arguments. After all, Illinois has *not* abolished self-defense and has *not* expressed a preference for long guns over handguns. But the municipalities can, and do, stress another of the themes in the debate over incorporation of the Bill of Rights: That the Constitution establishes a federal republic where local differences are to be cherished as elements of liberty rather than extirpated in order to produce a single, nationally applicable rule. See *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."); *Crist v. Bretz*, 437 U.S. 28, 40–53 (1978) (Powell, J., dissenting) (arguing that only "fundamental" liberties

Nos. 08-4241, 08-4243 & 08-4244                    9

should be incorporated, and that even for incorporated amendments the state and federal rules may differ); Robert Nozick, *Anarchy, State, and Utopia* (1974). Federalism is an older and more deeply rooted tradition than is a right to carry any particular kind of weapon. How arguments of this kind will affect proposals to "incorporate" the second amendment are for the Justices rather than a court of appeals.

AFFIRMED